UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
RAHEIM BRUNO,

                Plaintiff,                        **COMPLAINT**

        -against-                        Civil Action No.:

THE CITY OF NEW YORK,                       <u>**JURY TRIAL**</u>
CHRISTINE SCACCIA, Individually and as a      <u>**DEMANDED**</u>
member of the Bronx District Attorney's
Office, HILARY CHERNIN, Individually
and as a member of the Bronx District
Attorney's Office, and BRIAN HENNESSEY,
Individually and as a member of the New York
City Police Department,

                Defendant(s)
----------------------------------------------------------X

       Plaintiff Raheim Bruno, by and through his attorneys, DAVID HOROWITZ, P.C., complaining of the defendants, states as follows:

## INTRODUCTION

    1.    Plaintiff, Raheim Bruno, hereinafter referred to as ("Bruno") was wrongly convicted on March 5, 2013, of the attempted murder of Kevin Russo, hereinafter referred to as ("Russo") in Apartment 54 at 1410 Grand Concourse, Bronx, New York. Bruno was sentenced on July 2, 2013 to 22 years imprisonment followed by 5 years of post-release supervision and spent almost 9 years in jail and prison for a crime he did not commit.

    2.    On information and belief, Bruno's wrongful conviction was caused by the New York City Police Department, hereinafter referred to as ("NYPD") officers who threatened and coerced false testimony from witnesses Daeisha Luciano, hereinafter referred to as ("Luciano") Tinea James, hereinafter referred to as ("James") and Kevin Russo, hereinafter referred to as

("Russo"). Defendants also deliberately manipulated and failed to develop the DNA evidence in order to gain a conviction of Bruno.

3. Bruno was released on November 2, 2016, after the Supreme Court of the State of New York Appellate Division: First Judicial Department found that the verdict was against the weight of the evidence in a November 1, 2016 order.

## JURISDICTION

4. This Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331 over claims arising under 42 U.S.C. § 1983.

5. Supplemental jurisdiction over Bruno's state law claims exists pursuant to 28 U.S.C. § 1367 (a).

6. Bruno has complied with the requirements of New York General Municipal Law Section 50-I by serving a notice of claim on the City of New York Office of the Comptroller on January 27, 2017, within the time required by New York General Municipal law Section 50-e. More than 30 days have elapsed since the service of that notice and no offer of settlement has been made.

7. At the request of the City of New York Office of the Comptroller on April 3, 2017, Bruno submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

## VENUE

8. Pursuant to 28 U.S.C. § 1391 (b) venue is proper in the Southern District of New York, the judicial district in which the claims arose.

## JURY DEMAND

9. Pursuant to the Seventh Amendment of the United States Constitution, the plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

10.  Plaintiff RAHEIM BRUNO ("Bruno") was at all times material to this complaint was a citizen and resident of the State of New York. He is currently a citizen of the State of New York residing in Manhattan, New York.

11.  Defendant CITY OF NEW YORK is a political subdivision of the State of New York existing by virtue of the laws of the State of New York and is considered a person amenable to suit. The District Attorney, Bronx County is vested with authority to make policy for the City of New York concerning prosecutions and actions of assistant district attorneys in Bronx County, New York.

12.  The defendant CHRISTINE SCACCIA ("Scaccia"), at all times relevant to this complaint was a duly appointed and acting assistant district attorney, an agency of the defendant City of New York, acting under color of law and in her individual capacity within the scope of employment pursuant to statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

13.  The defendant HILARY CHERNIN ("Chernin"), at all times relevant to this complaint was a duly appointed and acting assistant district attorney, an agency of the defendant City of New York, acting under color of law and in her individual capacity within the scope of employment pursuant to statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

14.  The defendant BRIAN HENNESSEY ("Hennessey"), at all times relevant to this complaint was a duly appointed and acting police officer of the New York City Police Department, an agency of the defendant City of New York, with the rank of detective acting under color of law and in his individual capacity within the scope of employment pursuant to the

statutes, ordinances, regulations, policies, customs and usage of the City of New York and the State of New York.

## NATURE OF THE ACTION

15. This action arises under the Constitution and laws of the United States, particularly 42 U.S.C. §§ 1983, 1985 and 1988 and the laws of the State of New York for the malicious prosecution of Bruno for the attempted murder of Russo on November 16, 2007.

## THE FACTS

16. On October 25, 2007, at approximately 8:30 pm, Bruno and Allen Bell hereinafter referred to as ("Bell") took the A train and then the D train to the Bronx to purchase drugs for a man named "Sooki". Bruno and Bell arrived at apartment 54 at 1410 Grand Concourse, Bronx New York with the intent to purchase drugs. Daniel Newton hereinafter ("Newton") who is also known as "D" answered the door and let Bruno and Bell into the apartment. Once inside, Bruno handed Newtown $460 dollars and began playing with a brown pit bull while he waited for the drugs. Suddenly, and without warning, an unidentified African American male got up from a chair in the living room and shot Newton in the head. Immediately thereafter, Russo came out for an adjoining bedroom wearing a tank top and wrapped in a bed sheet. The unidentified male then shot Russo in the face.

17. Bruno and Bell then ran into another bedroom in an attempt to hide from the assailant. Bruno's life flashed before him. While Bruno and Bell were in the bedroom hiding, Bruno heard the assailant saying to a woman, "get me the drugs." Bruno overheard the woman say that she did not know where the drugs were. Bruno then heard another shot. The assailant then broke down the door where Bruno and Bell were hiding. The assailant went to shoot Bell, but the weapon jammed. Thereafter, the assailant left the apartment. Bruno and Bell waited

before fleeing the apartment to insure that the assailant had left. Bruno tripped on Russo's body which caused him to get Russo's blood on his left pant leg and his hands.

18. Bruno and Bell went to the subway station at 170th Street and the Grand Concourse in order to head back downtown. Bell picked up a soda bottle, and he and Bruno used it to clean off their hands and cloths.

19. Shortly after midnight on October 26, 2017, police arrived at Apartment 54. When the uniform officers (Officer Thomas and Officer Laporte) arrived at the apartment they found Russo shot in the face, bathed in blood and writhing in pain. Russo had a significant portion of his forehead blown away. Russo was not able to communicate. Officer Thomas walked down the hallway of the apartment and entered the living room area where he observed Newton shot in the head. Officer Thomas would later discover Lumildy Rosado in a rear bedroom shot in the head.

20. On information and belief Detective Hennessey interviewed Daeisha Luciano, who was twelve years old at the time of the murders and lived next door to apartment 54; and Tinea James who lived directly below Apartment 54.

21. On information and belief detectives and uniform officers investigated the subway station located at 170th Street and the Grand Concourse. Officer Robinson collected an iced tea bottle from a nearby trash receptacle, and a bottle cap that had blood on it from the station platform.

22. Russo was transported to Lincoln Hospital.

23. On November 14, 2007, nineteen days after Russo was shot in the head, Detective Hennessey showed him a two photo arrays at Lincoln Hospital. Hennessey asked whether Russo knew anyone; not whether Bruno shot him. Hennessey suggested to Russo that Bruno or Bell

shot him. Despite having suffered massive head trauma and being unable to speak, Russo would only <u>identify</u> Bruno and Bell (not as the shooters) by nodding his head and snapping his fingers which Hennessey chose to interpret as being the shooter(s).

24.     Two days later Bruno was arrested for murder.

25.     On November 16, 2007, Bruno would waive his right to an attorney and voluntarily gave a video and written statement about the events of October 25, 2007. Bruno never wavered in his denial of participation in the homicides; maintaining his innocence from the date of his arrest until his conviction was overturned.

26.     On information and belief, at the subsequent grand jury hearing, Russo testified that it was Jose Diaz that he was fighting with, that it was Jose Diaz that shot him, not Bruno or Bell. Notwithstanding identifying Jose Diaz, the grand jury nevertheless indicted Bruno.

27.     The trial commenced with jury selection on January 2, 2013. On February 5, 2013, ADA Scaccia would outline for the jury what the People intended to prove. The one thing Ms. Scaccia would never say during the entire trial is why? Why would Bell and Bruno out of the clear blue shoot their childhood friends and business (drug) associates. Simply put: there was no motive. There was no motive because Bell and Bruno did not commit the crimes that they were accused of.

28.     On February 19, 2013, ADA Scaccia called Luciano. Curiously, Luciano only came forward one month prior to Bruno and Bell's trial. Luciano testified that on the night of the shootings she was 12 years old. Luciano further testified she lived next door (Apt. 55) to apartment 54. Luciano claimed that she was awakened by the sounds of a struggle from the hallway outside of her apartment. Luciano then heard three gun shots in rather rapid succession.

Luciano then heard people running down the stairs and an unidentified person saying "Gutta" get the gun. Luciano admitted never seeing any of the alleged perpetrators.

29. The People's case relied heavily on the testimony of Russo. On February 20, 2013, Russo testified that he and Newtown grew up together and were friends. Russo and Newtown had sold crack cocaine in the Robert Fulton Houses. Russo also knew Bell from the same projects. Russo had difficulty recalling the simplest facts. When asked Bell's age he estimated Bell to be sixteen years old, when in fact he was one week away from his 25th birthday. Russo was asked to da an in court identification of Bell but was unable to point out Bell. Russo further testified that he did not remember how many people arrived at the apartment on the evening of the shooting. Russo claimed to have heard an argument between Newton and an unidentified male which lasted for one to two minutes.

30. Russo told the jury that he heard a single gunshot followed by another gunshot. Russo testified that before he heard the second shot, he heard Newtown's girlfriend (Rosado) scream "please don't."

31. Russo would then tell the jury several different versions of what happened when he left his bedroom, after hearing the gunshots.

32. First, he testified that he "must have collapsed." Then he testified that he ran into one of the perpetrators, and began to fight him. It was during the fight that Russo was shot in the head. Russo was unable to remember who shot him. ADA Scaccia attempted to use Russo's grand jury testimony in the People's case in chief because of his faulty recollection. During the hearing as to the admissibility of the grand jury testimony, Russo again admitted that he could not remember who shot him. Nevertheless, Russo would later state that he remembered Bell shooting him and Bruno being present in the apartment. Russo added, "…It's not because

someone like coached me to believing what I'm saying." Russo's memory was "refreshed" when he was shown a photograph of Newton on the floor after being shot. Russo now told that jury the Bell shot him. With Russo's memory now intact, ADA Scaccia would abandon admitting portions of Russo's grand jury testimony. Incredibly, Russo would tell the jury that he recognized Bruno as he fled the scene; this after being shot in the head at point blank range. As ADA Scaccia stated in her opening statement, "Half of his brain is gone."

33. On cross-examination, Mr. Russo's inconsistent trial testimony was raised before the jury. Russo was confronted with the fact that he testified that he was 32 years of age, when in fact he was actually 36; that there were puppies in the apartment when in fact there were none; the apartment number was 46 not 54; and that the apartment in question was located on the Grand Concourse and not 3rd Avenue; that Jose Diaz was in the apartment armed with a gun on the night of murders; that Russo and Diaz fought because Diaz was armed and that Diaz put a gun to Russo's head.

34. Russo was then confronted with inconsistencies in his grand jury testimony. Significantly, Russo testified at the grand jury that it was Jose Diaz that he was fighting with. Russo testified to the grand jury that is was Jose Diaz who shot him.

35. Following Russo's testimony People's exhibits 71, 72 & 73 (DNA reports) were admitted into evidence. The People then called criminalist Diana Ho. Ms. Ho was employed as a criminalist for Office of the Chief Medical Examiner. Ms. Ho testified that as part of her job duties and responsibilities she would, among other things, analyze DNA data. In this case, six evidence swabs were analyzed, three of which were determined to have human blood on them. Swab F-1 was taken from the hallway; F-2 from the pistol handle; F-4 from the plastic bottle; F-5 from the bottle cap and F-6 from the plastic bottle. The F-1 swab taken from the hallway did

not match Newton or Rosado. According to the DNA analysis the blood came from an unknown Male Donor referred to as "Male Donor A." The blood taken from the bottle cap (F-5) also did not match Newton or Rosado as was referred to as "Male Donor B." Importantly the blood taken from the pistol handle (F-2) was mostly consistent with Male Donor A and according to Ms. Ho she was able to deduce that some of the blood was contributed from a minor donor. This minor donor was not consistent with either Newton or Rosado. The minor contributor would be referred to as "Male Donor C." In other words, the DNA revealed three potential male donors. Bruno and Bell would both submit oral swabs so that their DNA could be compared to the aforementioned exemplars. DNA profiles were generated and Bruno was excluded from all of the exemplars. In other works, his DNA was not a match. Bell's DNA profile matched the source of the blood from the bottle cap (F-5) and the plastic bottle (F-6) and was determined to be Male Donor "B". Incredibly Russo was never asked to give a DNA sample. Assuming the Russo was either Male Donor "A" or Male Donor "C", logic dictates that another male was present at the time of the shooting which corroborates Bruno's version of the events: that another person murdered Newton execution style, murdered Rosado execution style, shot Russo in the face and attempted to murder Bell. The District Attorney's Office failed to consider for one moment the aforementioned possibility; choosing rather to prosecute a case rife with holes and inconsistencies. Not for a moment did the police department or the District Attorney's Office investigate another shooter, notwithstanding the incontrovertible DNA evidence which pointed to a third male in the apartment at the time of the shooting.

    35.    ADA Scaccia would next call Dr. Ronald St. Louis. The scant direct testimony was followed by cross-examination by Mr. Goldberg. Dr. St. Louis conceded that Russo's extensive medical records were replete with notations indicating that Russo suffered from long

term memory loss, short term memory loss and cognitive deficits; while clinging to the notion that Russo did presently suffer from any memory loss at the time he testified at trial.

36. The last witness called was Tinea James, hereinafter referred to as ("James"), who testified that on the night of the shootings she lived at 1410 Grand Concourse, Apartment 44, Bronx, New York. Newton lived in the apartment directly above James. James testified that she arrived home from work at approximately 5:30 pm, ordered pizza and settled in to watch, "The Next 48 Hours" on television. While watching television, and speaking to her mother on the telephone she heard loud sounds coming from Newton's apartment; sounds like people were "tussling". The loud sounds lasted for approximately one minute, when James then heard a gunshot, followed by Russo's screams. James testified that she heard Rosado screaming, a second gun shot, more tussling and fighting, and then more gunshots. James called 911. Following the call to 911, James goes to her door and peers out of the "peep" hole and observes two men (one dark skinned African-American and one light skinned African American) running down the steps of her apartment building. James would also observe the light skinned African American male holding what appeared to be a 2x4 piece of wood in his right hand. James would also testify that she heard the dark skinned male say, "Yo, Butters, did you get that?" James identified Bell at trial as being the light skinned African American male she observed running down the steps of her apartment building. James further testified that Bell was holding a piece of wood, immediately after the shootings. On cross-examination James admitted that she did not remember what she heard that night through her apartment door.

37. Jury deliberations commenced on February 27, 2013 and returned their verdict on March 5, 2013, finding the defendants not guilty of murder in the first degree, not guilty of

murder in the second degree and not guilty of manslaughter in the first degree. The jury illogically found the defendants guilty of attempted murder in the second degree.

38. On July 2, 2013, Bruno was sentenced to a determinate sentence of 22 years and 5 years post-release supervision.

39. On November 1, 2016, the Supreme Court, Appellate Division, First Department unanimously reversed the conviction of attempted murder in the second degree because the evidence was legally insufficient to establish beyond a reasonable doubt Bruno's accessorial liability for Bell's act of shooting Russo.

40. Upon information and belief, the District Attorney, Bronx, County's official policies were the driving force behind the Constitutional violations that caused Bruno's wrongful conviction. ADA Scaccia presented a very thin case against Bruno. The jury deliberated for four days and issued an inconsistent verdict: Bruno was found not guilty of murder in the first degree, not guilty of murder in the second degree and not guilty of manslaughter in the first degree, but guilty of attempted murder in the second degree.

41. In addition, on information and belief, when New York State Bar Association president Bernice Leber was elected in June 2008, she immediately recognized that wrongful convictions were a serious problem in New York and ordered the formation of a task force to address the issue. This task force reviewed a sample of over 50 wrongful conviction cases in New York and found that government error was involved in 58% of the cases surveyed.

42. From January 1989 through December 2013, the Bronx had 29 exonerations, according to the National Registry of Exonerations. The District Attorney Bronx County's policy of delaying disclosure to defendants is particularly disturbing give that it is was well known that the NYPD and its officers have coerced testimony, made false statements, and

destroyed information. These issues have been well publicized since at least 1994 when the Mollen Commission released its report detailing corruption in the NYPD.

43. On information and belief, on May 1, 2009, Jonathan Lippman, Chief Judge of the State of New York, troubled by the findings in the Final Report of the New York State Bar Association's Task Force on Wrongful Convictions, announced the creation of the New York State Justice Task Force. It is one of the first permanent tasks forces on wrongful convictions in the United States.

### COUNT ONE

### 42 U.S.C. § 1983 4th, 6th and 14 Amendment Claims for Wrongful Arrest, Malicious Prosecution and Denial of Due Process and a Fair Trial

44. Plaintiff hereby incorporates paragraphs 1 through 77 as if fully set forth herein at length.

45. Hennessy, Scaccia and Chernin, on information and belief, despite knowing that probable cause did not exist to arrest and prosecute Bruno for the murders of Newton and Rosado and the attempted murder of Russo, acted with malice individually and in concert to cause Bruno to be arrested, charged and prosecuted for the aforementioned crimes, thereby violating Bruno's rights pursuant to the Fourth, Sixth and Fourteenth Amendments of the United States Constitution.

46. Specifically, on information and belief, Hennessy, Scaccia and Chernin intentionally coerced statements and identifications knowing that they lacked probable cause to arrest, charge and prosecute Bruno, coerced Russo into making false identifications and giving false testimony. These actions deprived Bruno of his right to due process, including his right to a fair trial.

47. On November 1, 2016, the prosecution terminated in Bruno's favor when his conviction was overturned.

48. Bruno's cause of action was unavailable to him until November 1, 2016, upon the favorable termination of the criminal proceedings against him.

49. But for Hennessy, Scaccia and Chernin's unlawful and malicious conduct, on information and belief, Bruno would not have been arrested, and/or prosecuted and/or convicted for the murders of Newton and Rosado, and the attempted murder of Russo.

50. On information and belief, Hennessy, Scaccia and Chernin's actions depriving Bruno of his liberty without probable cause were in violation of clearly established constitutional law and no reasonable police officer in 2007 would have believed their actions to be lawful.

51. As a direct and proximate result of the defendant's actions, on information and belief, Bruno was wrongly convicted and imprisoned for more than eight years and suffered other grievous and continuing injuries and damages as set forth above.

52. Further, on information and belief, Hennessy, Scaccia and Chernin committed these acts under color of law as NYPD officers and District Attorneys employed by the City of New York.

## COUNT TWO

### State Law Malicious Prosecution Claim

53. Plaintiff hereby incorporates paragraphs 1 through 52 as if fully set forth herein at length and further alleges as follows.

54. Hennessy, Scaccia and Chernin, on information and belief, despite knowing that probable cause did not exist to arrest and prosecute Bruno for the crimes charged, acted

intentionally, recklessly and with malice to cause Bruno to be arrested, charged and prosecuted for the murders and attempted murders.

55. Hennessy, Scaccia and Chernin, on information and belief, intentionally withheld and misled the grand jury as to the indentity of the shooter exculpatory facts that further vitiated probable cause against Bruno including but not limited to that fact that evidence implacting Bruno was the product of fabrication and coercion.

56. Further, after causing prosecutors to initiate proceedings, the defendants failed to stop the prosecution even as their case fell apart. Specifically, Russo could not identify who shot him.

## COUNT THREE

### State Law Respondent Superior Claim Against
### The City of New York for Malicious Prosecution

57. Plaintiff hereby incorporates paragraphs 1 through 56 as if fully set forth herein at length and further alleges as follows.

58. On information and belief, at all times relevant to this complaint the individual defendants acted as agents of, and in the scope of their employment with, The City of New York. The conduct by which defendants committed the tort of malicious prosecution was undertaken while defendants were on duty, carrying out their routine investigative functions as NYPD officers and Assistant District Attorneys, and engaging in such conduct as would have been reasonably expected by their employer, The City of New York.

59. The City of New York is liable for its agents' state law tort of malicious prosecution under the doctrine of respondeat superior.

## COUNT FOUR

### 42 U.S.C. § 1983, 4th, 6th and 14th Amendment Claims under Monell

60. Plaintiff hereby incorporates paragraphs 1 through 59 as if fully set forth herein at length and further alleges as follows.

61. The District Attorney, Bronx County, on information and belief has final policy making authority for the City of New York regarding the customs, rules, and policies that govern the assistant district attorneys in the Bronx, including ADA Scaccia and ADA Chernin.

62. Bruno's *Monell* cause of action against the City of New York was unavailable to him until November 1, 2016, upon the favorable termination of the criminal proceedings against him.

WHEREFORE, Bruno prays as follows:

1. That the Court award compensatory damages to him against the defendants, jointly and severally on each and every claim herein, in an amount to be determined at trial;

2. That the Court award punitive damages to him against all individual defendants, in an amount to be determined at trial, that will deter such conduct by the defendants and the employees of the City of New York;

3. For a trial BY JURY;

4. For pre-judgment interest and recovery of his costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

5. For any and all other relief to which Bruno may be entitled.

Dated: New York, New York
October 3, 2017

                                          DAVID HOROWITZ, P.C.

                                          By: _____
                                               Steven J. Horowitz (1352)
                                        Attorneys for Plaintiff BRUNO
                                        171 Madison Avenue, Suite 1300
                                        New York, New York 10016
                                        (212) 684-3630—Telephone
                                        (212) 685-8617-- Facsimile