UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAHEIM BRUNO,

Plaintiff,

- against -

THE CITY OF NEW YORK,
CHRISTINE SCACCIA, Individually and as
a member of the Bronx District Attorney's
Office, HILARY CHERNIN, Individually
and as a member of the Bronx District
Attorney's Office, and BRIAN
HENNESSEY, Individually and as a member
of the New York City Police Department,

Defendants.

**MEMORANDUM**
**OPINION & ORDER**

17 Civ. 7552 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a Section 1983 action in which Plaintiff Raheim Bruno claims that the City
of New York (the "City"), Bronx County Assistant District Attorneys Christine Scaccia and
Hilary Chernin, and New York City Police Department ("NYPD") Detective Brian Hennessy
violated his constitutional rights. In 2007, Bruno was arrested and charged with murder and
attempted murder, and he was convicted in 2013 of attempted murder. In 2016, his conviction
was reversed on grounds of insufficient evidence.

The Complaint was filed on October 3, 2017, and asserts (1) violations of Section
1983 premised on false arrest, malicious prosecution, and denial of the right to a fair trial against
the individual defendants; (2) a state law malicious prosecution claim against the individual
defendants; (3) a state law malicious prosecution claim against the City, based on a theory of
respondeat superior; and (4) a <u>Monell</u> claim. (<u>See</u> Cmplt. (Dkt. No. 1) ¶¶ 44-62) Defendants

have moved to dismiss "pursuant to Rule 12(b)(6) or, in the alternative, [for] summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure."[1]  (Def. Mot. (Dkt. No. 23))  For the reasons stated below, Defendants' motion will be treated as a motion for summary judgment, and the motion will be granted.

## BACKGROUND

## I.    WHETHER DEFENDANTS' RULE 12(b)(6) MOTION SHOULD BE CONVERTED TO A RULE 56 MOTION FOR SUMMARY JUDGMENT

Defendants have submitted twenty-three exhibits in support of their motion.  (See Francolla Decl. (Dkt. No. 25))  While many of the exhibits are either integral to the Complaint or incorporated in the Complaint by reference (see, e.g., id., Exs. K, O, Q, R, U, and V), certain exhibits do not fit this description, and thus may not be considered on a motion to dismiss.  (See, e.g., id., Ex. W.)

Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under R. 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Accordingly, where, as here, a court considering a motion to dismiss is "presented with matters outside the pleadings," there are "two options." United States v. Chambers, 282 F.3d 147, 154 (2d Cir. 2002).  The court either "exclude[s] the extrinsic documents," or it

---

[1]  Defendants variously refer to their motion as brought under Rule 12(b)(6) and Rule 12(c).  See Pltf. Br. (Dkt. No. 24) at 9; Reply (Dkt. No. 32) at 2)  A Rule 12(c) motion is brought "[a]fter the pleadings are closed," however (see Fed. R. Civ. P. 12(c)), and the pleadings in this case have not closed, because Defendants have not filed an answer.  Accordingly, the Court construes Defendants' motion as having been brought under Rule 12(b)(6), with a request, in the alternative, to consider it as a motion for summary judgment.

"convert[s] the motion to one for summary judgment," giving the parties adequate notice and an opportunity to "submit the additional supporting material contemplated by Rule 56." Id. (citing Carter v. Stanton, 405 U.S. 669, 671 (1972) (per curiam); Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000); Morelli v. Cedel, 141 F.3d 39, 45-46 (2d Cir. 1998)). "'Federal courts have complete discretion to determine whether . . . to convert [a] motion [to dismiss] to one for summary judgment.'" Abbey v. 3F Therapeutics, Inc., No. 06 Civ. 409 (KMW), 2009 WL 4333819, at *5 (S.D.N.Y. Dec. 2, 2009) (quoting Carione v. United States, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005)).

"'The essential inquiry in determining whether it is appropriate to convert a motion [to dismiss] into a motion for summary judgment is whether the non-movant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.'" Ferguson v. Jones, 10 Civ. 817 (PGG), 2011 WL 4344434 at *2 (S.D.N.Y. Sept. 12, 2011) (quoting Costor v. Sanders, No. 07 Civ. 11311 (NRB), 2009 WL 1834374, at *2 (S.D.N.Y. June 16, 2009)).

Here, Defendants' moving papers provide notice that Defendants are moving for, "in the alternative, summary judgment pursuant to Rule 56." (Def. Mot. (Dkt. No. 23)) Moreover, Plaintiff does not oppose conversion of Defendants' Rule 12(b)(6) motion to a motion for summary judgment. Indeed, Plaintiff has filed his own Rule 56.1 Stmt. and supplemented the record with his own exhibits. (See Pltf. R. 56.1 Stmt. (Dkt. No. 28); Joslin Decls. (Dkt Nos. 30, 31)) Moreover, given the criminal trial, Plaintiff is familiar with the documents upon which Defendants rely. Accordingly, Defendants' motion to dismiss will be converted to a motion for summary judgment.

## II.  FACTS[2]

### A.  The October 25, 2007 Shootings

On the evening of October 25, 2007, Plaintiff Bruno and Allen Bell, Jr.

were present in Apartment 54, 1410 Grand Concourse, in the Bronx.  (See Def. R. 56.1 Stmt.

(Dkt. No. 26) ¶¶ 1, 11)  Daniel Newton shared this apartment with Kevin Russo.  The two had

gr[own] up together" in the Robert Fulton Houses in lower Manhattan, and became "real close

friends" while selling crack cocaine in that housing project.  (Trial Transcript ("Tr.") (Dkt. No.

30-4) at 6-8)  Newton's girlfriend, Mindy, also occasionally stayed at this apartment.  (Id. at 8-9;

Tr. (Dkt. No. 25-22) at 6)  Apartment 54 served as a "stash house" where Newton stored cocaine,

marijuana, and other drugs.  (Tr. (Dkt. No. 30-4) at 9-10)  Plaintiff Bruno and Bell went to

Apartment 54 on the evening of October 25, 2007, to purchase narcotics.  (See Def. R. 56.1 Stmt.

(Dkt. No. 26) ¶ 11)

Plaintiff says that he gave Newton money for drugs, and was playing with

Newton's pit bull when "[s]uddenly, and without warning, an unidentified African American

male got up from his chair in the living room and shot Newton in the head."  (Cmplt. (Dkt. No. 1)

¶ 16)  Kevin Russo then "came out f[rom] an adjoining bedroom wearing a tank top and wrapped

in a bed sheet.  The unidentified male then shot Russo in the face."  (Id.; see also Tr. (Dkt. No.

---

[2]  To the extent that this Court relies on facts drawn from a party's Local R. 56.1 Stmt., it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's R. 56.1 Stmt., that fact will be deemed admitted.") (citations omitted).  Where Plaintiff disputes Defendants' characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  Unless otherwise indicated, the facts the Court cites are undisputed.

30-5) at 10-11) Plaintiff claims that he and Bell "ran into another bedroom in an attempt to hide from the assailant." Bruno then overheard an exchange between the assailant and a woman, which was followed by another gunshot. (Cmplt. (Dkt. No. 1) ¶ 17) The shooter then forced his way into the bedroom in which Bruno and Newton were hiding, and attempted to shoot Bell, but his firearm jammed. (Id.) The shooter then left the apartment. After waiting to make sure the shooter was gone, Plaintiff and Bell fled the apartment. On his way out, Plaintiff tripped over Russo's body, staining his pant leg and hands with the victim's blood. (Id.)

Several other residents of 1410 Grand Concourse heard gunshots from Apartment 54 that night. Clarence Giles, who lived on the same floor as Newton and had seen two young men enter Newton's apartment, was watching television when he heard fighting, and then a gunshot, followed shortly by a second gunshot. (Giles DD5 (Dkt. No. 25-9)) Giles opened his apartment door, and saw a naked woman attempt to leave Apartment 54. The woman was pulled back inside. (Id.) Giles heard "one or two more shots that were muffled or far from the ap[artmen]t door." Giles then apparently shut his apartment door and peered through the door's peephole. (Id.) Giles observed the same two young men he had seen enter Apartment 54 run out of the apartment, and heard one of the men say to the other "Butters grab the knife." (Id.)

Daisha Luciano – who was then twelve years old and lived next door to Apartment 54 – was home alone with her seven-year-old brother that night. (Tr. (Dkt. No. 25-22) at 8-9) Luciano had been sleeping, and was woken by "screaming and tussling." (Id. at 10) She recognized Russo's voice, and heard him say 'Yo D, Yo D, get up." (Id.) As Luciano tried to call her mother, she heard a gunshot. After a pause, she heard a second gunshot. (Id. at 11-12) After another pause, she heard a third gunshot. (Id. at 13-14) Luciano then heard people running down the stairs, one of whom said "Gutta, get the gun." (Id. at 14)

Tinea James lived in Apartment 44 – immediately below Newton's apartment – and was home alone that night. (Tr. (Dkt. No. 25-11) at 4-5) She heard "loud noises . . . like stuff was rumbling upstairs, like tussling or somebody was moving something," and then heard a gunshot. (Id. at 6) Before the gunshot, she heard Russo "screaming [']D, D, D,['] then [she] heard another shot go off, [and] then [Russo] started screaming for somebody to call the police." (Id. at 9) James also "heard a girl screaming as well and she was screaming for somebody to help her." (Id.) James called 911, but did not complete the call. (Id. at 9, 14) She then looked out the peephole in her apartment door. She observed two men run down the stairway connecting the fourth and fifth floors. She saw the first man only from behind, but the other "c[a]me straight towards [her] door." (Id. at 11) The first man had darker skin, and the second was "light-skinned." (Id.) She heard the first man say, "Yo, Butters, did you get that?" (Id. at 12; James DD5 (Dkt. No. 25-10)) James then again called 911. (Tr. (Dkt. No. 25-11) at 13)

After fleeing Apartment 54, Plaintiff and Bell headed to the subway station at 170th Street and Grand Concourse. (Cmplt. (Dkt. No. 1) ¶ 18) At about midnight, Michael Hyatt was sitting on a bench in that station. Hyatt observed two men in the station – an African-American and a Hispanic. Both men had "red hands." Hyatt believed that the red substance on their hands was paint or blood. One of the men picked up a discarded bottle from a bench, and both men then used liquid in the bottle to wash off their hands. The African-American man threw the bottle into a trash can on the platform, and both men then boarded a Manhattan-bound D train.[3] (See Hyatt Written Stmt. (Dkt. No. 25-4); Hyatt DD5 (Dkt. No. 25-3) at 1) Hyatt told officers what he had observed, and provided a written statement to the police between

---

[3] Bruno does not dispute that he and Bell were the two men Hyatt saw that night. (See Cmplt. (Dkt. No. 1) ¶ 18 ("Bell picked up a soda bottle, and he and Bruno used it to clean off their hands and cloth[e]s."); Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 11; Pltf. R. 56.1 Stmt. (Dkt. No. 28) ¶ 11)

approximately 1:35 a.m. and 1:45 a.m. on October 26, 2007. (Hyatt DD5 (Dkt. No. 25-3) at 1; Hyatt Written Stmt. (Dkt. No. 25-4)) The NYPD's Crime Scene Unit collected DNA samples from the bottle and bottle cap. (See Hyatt DD5 (Dkt. No. 25-3) at 1; Laboratory Report (Dkt. No. 25-20) at 1)

**B.** **The NYPD's Investigation**

Just after midnight on October 26, 2007, NYPD Officers Laporte and Thomas responded to a call of shots fired at 1410 Grand Concourse. (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 1; Tr. (Dkt. No. 25-2) at 3-4) Upon their arrival, a man waiting for the officers said that he had heard shots coming from a fifth floor apartment. (See Tr. (Dkt. No. 25-2) at 5) The officers went to the fifth floor. The front door to Apartment 54 was partially open, and officers entered the apartment. (Id.) The officers found a man who had been shot in the head; he was "squirming around like he was in pain . . . on the floor." (Id.) He "had a huge injury on his face . . . a big dent in his head," and was unable to communicate with the officers. When asked what had happened, the victim responded with "gibberish." (Id. at 6)

The wounded man was later identified as Kevin Russo. (See Notification and Response DD5 (Dkt. No. 25-6)) The officers called an ambulance for Russo, and Officer Laporte stayed with Russo as Officer Thomas searched the apartment. (Tr. (Dkt. No. 25-2) at 6) In the living room, Officer Thomas found "another male shot . . . in his head" and "not moving at all." In another room, Officer Thomas discovered "a woman inside, not wearing anything"; she "was shot . . . in the head" and "looked dead." (Id. at 6-7) The male victim was subsequently identified as Daniel Newton; the female victim was Lumildy Rosado. (See Unusual Occurrence Report (Dkt. No. 25-1)) Both were pronounced dead at the scene. (Id.) Russo was taken to the hospital "in [a] likely to die condition." (Id.)

7

Defendant Hennessy – a member of the 44th Precinct detective squad – was assigned to investigate the shootings. (Tr. (Dkt. No. 25-7) at 2-3)  He arrived at 1410 Grand Concourse as emergency medical technicians were carrying Russo out of the apartment building. (Notification and Response DD5 (Dkt. No. 25-6))  Once inside Apartment 54, Detective Hennessy and other officers identified Daniel Newton from identification found in his wallet. (Tr. (Dkt. No. 25-7) at 5)  Officers of the NYPD's Crime Scene Unit ("CSU") then arrived at Apartment 54.  CSU took DNA samples and recovered evidence from the apartment, including firearms, currency, marijuana, and cocaine. (Id. at 4; Unusual Occurrence Report (Dkt. No. 25-1))  At about 1:00 a.m., Hennessy learned that Hyatt had told police that he "had observed two males[,] one dark skinned, and one light skinned[,] pick up a soda bottle and wash blood off their hands" inside the subway station.

Two days later, on the evening of October 27, 2007, an anonymous caller named "Tisha" told the 44th Precinct detective squad that "Allen Bell, Jr., shot those people at 1410 Grand Concourse," and that Bell lived in Manhattan. (Anonymous Caller DD5 (Dkt. No. 25-8))  The next day, Detective Hennessy interviewed Giles at the 44th Precinct.  Giles told Hennessy that he had seen an African-American man and a Hispanic man enter Newton's apartment on the night of the shootings; that he subsequently heard fighting and gunshots, and observed a naked woman attempt to leave Newton's apartment; that he heard additional gunshots; that he saw the two men he had observed earlier run out of the apartment and down the stairs; and that he heard one of the men refer to the other as "Butters." (Giles DD5 (Dkt. No. 25-9); Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 5)

On October 29, 2007, Detective Hennessy interviewed Tinea James.  James told Hennessy that on the night of the shooting she had heard loud noises that sounded like "tussling,"

and heard Russo screaming. James then heard gunshots and a woman screaming. James then observed two men, one with lighter skin and one with darker skin, run down the stairs. She heard one of the men refer to the other as "Butters." (James DD5 (Dkt. No. 25-10))

On November 1, 2007, Detective Hennessy interviewed Katricha Newton, a relative of victim Daniel Newton.[4] (Newton DD5 (Dkt. No. 25-12)) Newton told Detective Hennessy that she had "heard from an unidentified person that Allen Bell[] and Raheim Bruno were the people responsible for the shooting and h[]omicide." (Id.) Newton further reported that, on the night of the shootings, a man named Justin Hayes "heard Raheim Bruno state 'I killed those mother fuckers in the Bronx.'" (Id.) She also stated that "everyone in the Fulton Projects" in Manhattan – where Newton, Russo, Bell, and Bruno grew up (see Tr. (Dkt. No. 30-4) at 6-8, 11-12, 14) – is "saying that Raheim Bruno and Allen Bell are the people [who] shot" Daniel Newton and Russo, but that no one would talk to the police. (Id.) Detective Hennessy asked Katricha if she knew anyone who went by the nickname "Butters," and Newton responded that "Butters" was Allen Bell's nickname. (Id.)

Detective Hennessy also attempted to speak with Kevin Russo in the hospital. Between the night of the shootings and November 13, 2007, Hennessy tried to speak with Russo on four separate occasions, but was not successful. (Tr. (Dkt. No. 25-7) at 32) On November 13, 2007, Russo shook Hennessy's hand and appeared to recognize him. (Id. at 33; Hospital Visit DD5 (Dkt. No. 25-13)) Russo could not speak, however. (Tr. (Dkt. No. 25-7) at 33) Detective Hennessy asked Russo whether, when he recovered, he would be able to recognize the person who shot him. (Hospital Visit DD5 (Dkt. No. 25-13)) Russo "nod[d]ed his head up and down[,]

_____

[4] The record does not reveal whether "Katricha Newton" was the anonymous caller "Tisha."

9

meaning yes." (Id.) Hennessy told Russo that he would return to the hospital when Russo was feeling better, to see whether Russo could make an identification. (Id.; Tr. (Dkt. No. 25-7) at 33)

Detective Hennessy returned to the hospital the next day, November 14, 2007, with another detective. (Tr. (Dkt. No. 25-7) at 33; Russo Identification DD5 (Dkt. No. 25-14)) The detectives brought with them two photo arrays, each containing six photographs. The first photo array contained an image of Raheim Bruno; the second photo array contained an image of Allen Bell, Jr. (Russo Identification DD5 (Dkt. No. 25-14)) Because Russo could still not speak, the detectives told him to point to the photograph of anyone he recognized, and to snap his fingers and nod his head up and down. (Id.) Russo identified Bruno's image in the first photo array, and signed his name under Bruno's image. He then identified Bell's image in the second photo array, and signed his name below Bell's image. (Id.)

The detectives then showed Russo the first photo array again, and asked him if the person he had identified – Bruno – had had a gun. Russo "snapped his finger[s] and nod[d]ed his head up and down." (Id.) The detectives then showed Russo the second array again, and asked him if the person he had identified in this array – Bell – had had a gun. Russo moved "his head side to side[,] meaning no[,] and did not snap his finger[s]." (Id.)

On the evening of November 16, 2007, and continuing into the morning of November 17, 2007, Detective Hennessey questioned Bruno at the 44th Precinct. (See Cmplt. (Dkt. No. 1) ¶ 25; Tr. (Dkt. No. 25-7) at 15-20) Bruno's account of the night of the shootings was memorialized in a three-page written statement. (Tr. (Dkt. No. 25-7) at 18-20) In his statement, Bruno states that at 8:30 or 9:00 on the night of the shootings someone named Sookie "wanted work" and paid Bruno $20 to "go uptown to D's house." (Id. at 20) Bruno and Bell purchased "two nicks of weed" and smoked "three blunts" before taking the subway uptown to 170th Street

10

and Grand Concourse and walking to Newton's apartment. (Id. at 20-21) Bruno gave the

following account of what happened once he and Bell arrived at Newton's apartment:

> We walk up the stairs, I see a black guy come up the stairs and go to the apartment
> across from D's. Then we was knocking on the door for a while, knocking. D
> comes to the door and we know, and he knows . . . why we're there because
> Sookie called him and said we were coming up. So D says what you got for me. I
> gave the bread. I playing with the brown pit bull. A black dude gets up from the
> single chair and took out a black gun, looked like a cop's gun and shot D in his
> head. S[o]n just fell. Then Kevin came, he had a bedsheet wrapped around his
> waist and a tank top. Dude shot Kevin in his face but he wasn't dead, he was still
> alive. I go in the room, I'm calling Butter. Get in here. Then Butter came in.
> Then I hear another shot. My whole life flashed before my eyes. I thought if this
> guy comes in I'm going to push Butter before me. I hear Shorty, the guy is saying
> get the work. He said it a couple of times. I'm hearing her. I don't know where
> nothing is at. I'm on your side. Not a minute later I hear another shot. Now he
> comes in the room for us, he goes for Butter first, the gun is jammed. He went to
> shoot him. I'm thinking shit, ran out of bullets. He's worked up, he took out my
> pockets and my wallet in my front pocket. He dig in Butter's pocket but I didn't
> think he got his wallet. He breezes out the crib. We were shocked so we waited to
> hear the door close. We waited for a little. We left. While I was going I almost
> slipped on all the blood and tripped over Kev. I had it all over my pants on my left
> leg. We got back to 170th Street and Grand Concourse to take the D train. We
> had mad blood on us. On my hand and pants. We walked to the back of the
> platform. Butter picked up a bottle of soda from the floor and I poured it on my
> hand, wiped the blood off. Butter wiped the blood off with his sweater.

(Tr. (Dkt. No. 25-7) at 20-23)

Bruno further stated that he and Bell took the subway "back to the projects," and

Bruno gave Sookie "the product," went home, showered, and went to Bell's residence. He and

Bell agreed "we won't talk about it." (Id. at 21-23)

During the early morning hours of November 17, 2007, Bruno was arrested and

charged with murder in the first degree; murder in the second degree; attempted murder; burglary;

and criminal possession of a weapon. (See Supplemental Unusual Occurrence Report (Dkt. No.

25-16)) Bell was arrested on November 29, 2007. (Id.)

On December 28, 2007, Assistant District Attorney ("ADA") Scaccia visited Russo in the hospital. (Tr. (Dkt. No. 30-1) at 3) Scaccia took grand jury testimony from Russo – apparently by video conference – concerning the circumstances of the shootings. (Id. at 3-4) During his testimony, Russo stated that Jose Diaz, "a close friend of [his]" whom he had known "[f]or about ten years," was in Apartment 54 on the night of the shooting. (Tr. (Dkt. No. 30-2) at 2) After others "start[ed] fighting in the living room," Russo stepped out of his bedroom and "start[ed] hitting Jose," because Jose "had a gun in his hand." (Id. at 7, 9, 10) Jose then "turn[ed] towards [Russo], [and] put the gun to [Russo's] forehead." (Id. at 11) Russo further testified that "young Allen Bell shot [Russo]," and that Bruno was present in the apartment at the time of the shooting. (Tr. (Dkt. No. 25-17) at 11) After Russo gave this testimony, ADA Scaccia informed Russo that Jose Diaz had not been present in Apartment 54 on the night of the shooting. (Tr. (Dkt. No. 30-3) at 3)

On January 10, 2008, Bruno and Bell were named in an indictment charging them with murder in the first degree, attempted murder, two counts of murder in the second degree, two counts of manslaughter in the first degree, assault in the first degree, and criminal possession of a weapon in the second degree. (Indictment (Dkt. No. 25-18))

On April 20, 2008, the Office of the Chief Medical Examiner issued a laboratory report analyzing the DNA collected from Newton's apartment. The Medical Examiner had examined six DNA samples obtained from the apartment hallway wall, from a pistol handle, from other firearms, and from the victims' bodies, as well as DNA samples obtained from the soda bottle and bottle cap Bell and Bruno had allegedly handled in the subway station. (See Laboratory Report (Dkt. No. 31-1) at 9, 15) The report identified the source of the sample taken from the apartment hallway as an unknown "Male Donor A"; the source of the sample taken from

the bottle cap as an unknown "Male Donor B"; and the sources of the sample taken from the pistol handle as a combination of Male Donor A (a major contributor to the sample) and an unknown "Male Donor C" (a minor contributor to the sample). (Id. at 10-11) The sample taken from the soda bottle was comprised of a mixture of at least three people, of which Male Donors A and B were both included as contributors. (Id. at 11)[5]

Plaintiff Bruno's DNA did not match any of the DNA profiles developed through the Medical Examiner's analysis. (Pltf. R. 56.1 Stmt. (Dkt. No. 28) ¶ 32; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 29) ¶ 32) A subsequent laboratory report issued by the Medical Examiner on February 7, 2013, concluded that Bell was the source of the sample from the bottle cap, and that Bell was "Male Donor B." (See Laboratory Report (Dkt. No. 25-20) at 1) The identity of Male Donors A and C remain unknown. (Id.) Although the records of the Medical Examiner show that the Medical Examiner requested a DNA sample from Russo, there is no evidence that such a sample was ever provided and compared to the samples obtained from Newton's apartment.[6] (See Laboratory Report (Dkt. No. 31-1) at 33)

## C. Trial

The charges against Bruno and Bell proceeded to trial in January 2013, about five years after the indictment. The People's witnesses included Detective Hennessey; Tinea James;

---

[5] The other swabs were either only suitable for direct comparison, or insufficient for high sensitivity DNA testing. (Id. at 11)

[6] A February 21, 2008 note in the Medical Examiner's records states: "[S]poke with Det. Hennessy. I told him that DNA testing was performed and at this time an exemplar from the living victim, Kevin Russo, would be needed. He stated that he could get this within the next 2-3 days." An April 21, 2008 note reads: "Spoke to Det. Hennessy about the request for the living victim's exemplar (Kevin Russo) made 2 months ago on 2/21/08. He said that the victim is currently in a nursing home in Staten Island. He said that he will get an elimination sample from the victim in 1-2 days." An April 29, 2008 note states: "Did not get a chance to get the exemplars. Will have them by next Tuesday." There is no further discussion in the Medical Examiner's records of a Russo DNA sample. (See Laboratory Report (Dkt. No. 31-1) at 33)

Daeisha Luciano; Kevin Russo; a representative of the Medical Examiner's Office; and the police officer who had interviewed Michael Hyatt. Because Plaintiff's claims in the instant case are premised largely on Russo's testimony, Russo's testimony will be recounted in detail below.

### 1. **Russo's Testimony**

At trial, Russo described how he had come to live at Apartment 54 with Daniel Newton, and explained that Newton sold drugs from the apartment. (Tr. (Dkt. No. 30-4) at 7-11) Russo testified that he knew "some of the people that Danny [Newton] was dealing with." (Id. at 11) When asked whether he knew Allen Bell from his time growing up in the Fulton Houses, Russo explained that he knew two Allen Bells, father and son. (Id.) Russo testified that he was friendly with the father, and knew Allen Bell, Jr. through this connection. (Id. at 12)

Russo – who stated at trial that he was 32 years old[7] – testified that Allen Bell, Jr. was "probably . . . about half my age. I would say he's about 16 now." (Id. at 5, 12) As of January 2013, when trial began, Allen Bell, Jr. was at least 25 years old. (See Supplemental Unusual Occurrence Report (Dkt. No. 25-16) (stating Bell's age on November 29, 2007 as 19 years old)) Moreover, when Russo was asked to identify Allen Bell, Jr. at trial, Russo stated that he "d[id] not see him" in the courtroom. (Tr. (Dkt. No. 30-4) at 12; Pltf. R. 56.1 Stmt. (Dkt. No. 28) ¶ 27) Russo further testified he did not recall if Newton had ever "done business with Allen Bell in [Russo's] presence." (Tr. (Dkt. No. 30-4) at 13-14)

Russo identified Bruno in court, testified that he had met Bruno through mutual friends, and recalled occasions in which he, Bruno, and Newton had been together. (Id. at 14-15)

---

[7] NYPD reports state that Russo was 31 at the time of the shooting. If these reports are accurate, Russo would have been at least 36 at the time of trial. (See, e.g., Unusual Occurrence Report (Dkt. No. 25-1); Notification and Response DD5 (Dkt. No. 25-6); Identification of Perps DD5 (Dkt. No. 25-14) at 1; Supplemental Unusual Occurrence Report (Dkt No. 25-16))

Russo did not recall Bruno or Bell coming to Newton's apartment before October 2007, however. (Id. at 14-15)

Russo testified that, on the night of the shooting, he was playing video games in his bedroom, and heard a knock on the apartment door. (Tr. (Dkt. No. 30-5) at 7) He then heard Newton arguing with another man; Newton said, "fuck you, I ain't giving you shit," and "[g]et the fuck out of here." (Id. at 8) Russo then heard a gunshot, and then heard Newton's girlfriend Mindy screaming, "[p]lease don't, please don't," followed by a second gunshot. (Id. at 9-10) Russo wrapped himself in a bedsheet and walked out of his room, and saw Newton "on the ground unresponsive." (Id. at 10) Russo went "to assist Danny [Newton] and . . . ran into one of the perpetrators, started physically fighting with him and in that process [the shooter] . . . place[d] the gun to the side of [Russo's] head and pull[ed] the trigger." (Id. at 11) Russo "remember[ed] the flash going off and . . . getting hit in [his] head, like [he] saw quick stars." (Id. at 12) When asked who shot him in the head, Russo responded: "I cannot remember. After going blank, blacked out, I don't remember much. The next thing I remember after that was being in the hospital." (Id. at 12)

At a sidebar conference, ADA Scaccia told the trial judge that she wanted to introduce portions of Russo's grand jury testimony as past recollection recorded, and would attempt to lay a foundation for doing so. (Tr. (Dkt. No. 30-6) at 4) Scaccia sought to admit Russo's testimony that Allen Bell had shot Russo, and that Bruno was present inside the apartment at the time of the shooting. (Id. at 5-6) Defense counsel objected to the introduction of Russo's grand jury testimony. The court reserved decision pending additional testimony concerning the present state of Russo's memory. (Id. at 26-27)

When ADA Scaccia resumed her direct examination of Russo, Russo testified that after he "hear[d] this commotion," he went "looking for Danny, and while [he was] going down the hallway . . . [he] r[a]n into someone, and that person was holding a pistol. [He] started struggling with that person, physically fighting until [he] collapsed." Russo saw a gun in that person's hand before he was shot. (Id. at 29) Russo testified that he could not recall anyone in the apartment other than the shooter, Newton, and Mindy, and that he did not remember who was holding the gun. (Id. at 30, 33)

Russo was then questioned outside the presence of the jury to determine whether a foundation could be laid for the admission of portions of his grand jury testimony as past recollection recorded. Russo testified that his grand jury testimony was truthful, based on what he remembered at the time. (Tr. (Dkt. No. 30-7) at 9-10) When asked whether he had watched his videotaped grand jury testimony, Russo at first said "No, ma'am." (Id. at 10) When asked again, he stated, "Um, yes, I do remember." (Id.) Russo then testified that the videotaped testimony had refreshed his recollection as to who had shot him. (Id.) But when asked whether he now recalled who had shot him, Russo said, "[I] still don't remember." (Id. at 12)

While still outside the presence of the jury, ADA Scaccia asked Russo about Jose Diaz's role in the shooting. Russo stated that although he had testified before the grand jury that Jose Diaz was in the apartment on the night of the shooting, he "ha[d] no idea" why he had said so, did not now recall Diaz being there, and "believe[d] he was not in the apartment that night." (Tr. (Dkt. No. 30-2) at 2-3)

On cross-examination before the jury, Russo conceded that ADA Scaccia had told him after his grand jury testimony that Diaz had not been in the apartment, but denied that he was relying on ADA Scaccia in now testifying that Diaz was not in the apartment. (Id. at 6) Russo

testified that when he reviewed his grand jury testimony – in which he stated that he had "start[ed] hitting Jose" because Jose "had a gun in his hand" – he "remember[ed] the questions, but [his] answers make no sense to me." (Id. at 10) Russo did not recall testifying in his grand jury testimony that Jose had "put the gun to my forehead," and maintained that his grand jury testimony about Diaz was a "mistake." (Id. at 3, 11)

While outside the presence of the jury, Russo insisted that his grand jury testimony that "young Allen Bell shot me" "was the truth." (Tr. (Dkt. No. 30-7) at 14) As to Bruno, Russo acknowledged that he had told the grand jury that Bruno was present in the apartment during the shooting. When asked whether he had a present recollection that Bruno was in the apartment, Russo stated: "He was in the apartment." (Id.) When asked who was in the apartment at the time of the shooting, Russo testified that "[t]here was me, Daniel[], Mindy and the two perpetrators. . . . Mr. Bruno and Mr. Bell." (Id. at 14-15) Before the jury the previous day, however, Russo had recalled only that himself, Newton, Mindy, and the shooter were in the apartment. (Id.)

When asked why he now remembered who had shot him, when he had been unable to do so the day before, Bruno stated: "It's clearer now. It's not because someone like coached me to believing what I'm saying. I could see it, that day is so clear as if was yesterday." (Id. at 17) Russo explained that his memory was clearer because he had seen "the photo of my friend on the ground." ADA Scaccia had introduced this photograph of Newton at trial. This photograph "was the last image [Russo] had of [Newton] before [Russo] left the apartment, before they took [Russo] out," and the photograph had "brung back that whole day like it was just like it just happened." (Id.) After this testimony, ADA Scaccia withdrew her application to admit portions of Russo's grand jury testimony as past recollection recorded, and resumed her direct examination of Russo before the jury. (Id. at 18)

Russo went on to tell the jury that Allen Bell, Jr. had shot him. (Tr. (Dkt. No. 30-8) at 4-5) He explained that the photograph of Newton he had seen in the courtroom had brought him back to the day of the shooting, helping him to remember what he had previously been unable to recall. (Id. at 5) ADA Scaccia and Russo then engaged in the following exchange:

> Q: Other than seeing that photograph here in this courtroom, did I or anyone else between the time you were on that stand yesterday and the time that you're back here today, show you any other pictures?
>
> A: No, ma'am.
>
> Q: Did anyone try to tell you that you needed to change what you said yesterday?
>
> A: No.
>
> Q: Was today in court the first time that you indicated that you have a different memory today than you did yesterday?
>
> A: Yes.
>
> Q: You also indicated yesterday that other than it being Danny, Mindy, yourself and Allen Bell Jr. in the apartment now, that you didn't know as you sat there yesterday whether or not anyone else had been in the apartment?
>
> A: Yes.
>
> Q: Is that – do you have a different memory of that today as well?
>
> A: There was myself, I, my friend Daniel, his friend Mindy and the two people that came to, that caused all this commotion.

(Id. at 5-6) Russo testified that Bruno was present in the apartment that night, explaining that he recalled Bruno walking past him towards the door of his apartment after he had been shot. (Id. at 7-8) Russo also testified that he recalled that Bruno and Bell had previously come to the apartment to purchase drugs. (Id. at 8) Finally, Russo asserted that he was "very confident" that Bell was the person who shot him. (Id. at 9)

### 2.    **Verdict**

On March 5, 2013, the jury found Bruno and Bell guilty of attempted murder in the

second degree, and found them not guilty of murder in the first degree, murder in the second

degree, and manslaughter in the first degree with respect to the shootings of Newton and Rosado.

(See Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 19; Pltf. R. 56.1 Stmt. (Dkt. No. 28) ¶ 19)

### 3.    **Appellate Proceedings**

On November 1, 2016, the Appellate Division, First Department reversed Bruno's

conviction and dismissed the indictment against him, holding that "[t]he evidence was legally

insufficient to establish beyond a reasonable doubt defendant's accessorial liability for his

codefendant's act of shooting the victim. . . . [I]t failed to show, even when viewed in the light

most favorable to the People, that defendant shared the codefendant's intent to cause the victim's

death." (See People v. Bruno (Dkt. No. 31-2)) On August 1, 2017, the First Department reversed

Allen Bell's conviction on the ground that the trial court had improperly admitted business

records of Jose Diaz. (See Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 21; Pltf. R. 56.1 Stmt. (Dkt. No. 28)

¶ 21) Bell later pleaded guilty to assault in the second degree. (See Def. R. 56.1 Stmt. (Dkt. No.

26) ¶ 22; Pltf. R. 56.1 Stmt. (Dkt. No. 28) ¶ 22; Certificate of Disposition and Webcrims

Summary for Allen Bell (Dkt. No. 25-23))

## III.    **THE COMPLAINT**

The Complaint was filed on October 3, 2017, and names ADA Scaccia, ADA

Hilary Chernin, Detective Hennessy, and the City of New York as defendants. (See Cmplt. (Dkt.

1)) Plaintiff alleges violations of Section 1983 premised on false arrest, malicious prosecution,

and denial of the right to a fair trial against the individual defendants; a state law malicious

prosecution claim against the individual defendants; a state law malicious prosecution claim

against the City, based on a theory of respondeat superior; and (4) a <u>Monell</u> claim. (<u>See</u> Cmplt. (Dkt. No. 1) ¶¶ 44-62)

As discussed above, Defendants have moved to dismiss pursuant to Rule 12(b)(6) or, in the alternative, for summary judgment on all of Plaintiff's claims. (Def. Mot. (Dkt. No. 23))

## DISCUSSION

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." <u>Beyer v. Cty. of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008) (citing <u>Guilbert v. Gardner</u>, 480 F.3d 140, 145 (2d Cir. 2007)). "'[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.'" <u>Lesavoy v. Lane</u>, No. 02 Civ. 10162 (RWS), 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting <u>Bay v. Times Mirror Magazines, Inc.</u>, 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" <u>Spinelli v. City of New York</u>, 579 F.3d 160, 166 (2d Cir. 2009) (quoting <u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . . [M]ere conclusory allegations or denials . . . cannot by themselves

create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593

F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d

1451, 1456 (2d Cir. 1995)).

## II.    ABANDONMENT OF CLAIMS

"'Federal courts may deem a claim abandoned when a party moves for summary

judgment on one ground and the party opposing summary judgment fails to address the argument

in any way.'" Maher v. Alliance Mortg. Banking Corp., 650 F.2d 249, 267 (E.D.N.Y. 2009)

(quoting Taylor v. City of New York, 269 F. Supp.2d 68, 75 (E.D.N.Y. 2003); see also Douglas v.

Victor Capital Group, 21 F. Supp.2d 379, 393 (S.D.N.Y. 1998) (adopting Report and

Recommendation) ("In addition to his ADA discrimination claim, Douglas' complaint asserted

claims for retaliation, under the NYSHRL[,] and for breach of employment contract. Defendants'

summary judgment motion specifically addressed all of these claims. Douglas' opposition

papers, however, addressed none of these claims. . . . Thus, the Court deems all of the remaining

claims in the complaint to be abandoned, and recommends that defendants be granted summary

judgment dismissing these claims." (internal citations omitted)); Cowan v. City of Mount Vernon,

95 F. Supp.3d 624, 645 (S.D.N.Y. 2015) (adopting Report and Recommendation) ("In her

Memorandum of Law in Opposition to Defendants' Motion, Plaintiff fails to address her § 1983

claim against Harris. Indeed, in the portion of her brief addressing these claims, Plaintiff does not

mention Harris. Defendants addressed Plaintiff's § 1983 claim against Harris in their

Memorandum of Law . . . . Plaintiff did not respond to Defendants' arguments . . . and, therefore,

the Court deems this claim abandoned and grants Defendants' motion as to this claim." (citations

omitted)); Wiles v. City of New York, No. 13 Civ. 2898 (TPG), 2016 WL 6238609, at *10

(S.D.N.Y. Oct. 25, 2016), aff'd, 724 F. App'x 52 (2d Cir. 2018) ("[P]laintiff does not address

defendants' arguments as to his claims for malicious prosecution. . . . Thus, the Court holds that plaintiff has abandoned his claims for malicious prosecution." (internal citation omitted)).

Here, Defendants' moving brief addresses all of Plaintiff's claims against all Defendants. (See Def. Br. (Dkt. No. 24)) In his opposition, however, Plaintiff does not respond in any fashion to Defendants' arguments concerning (1) Plaintiff's denial of fair trial claim; or (2) Detective Hennessy.[8] (See Pltf. Opp. (Dkt. No. 27)) The Court concludes that Plaintiff has abandoned his right to fair trial claim, and has abandoned all claims against Defendant Hennessy. Accordingly, Defendants' motion for summary judgment will be granted as to those claims.[9]

---

[8] For example, Plaintiff's discussion of malicious prosecution addresses only the post-indictment conduct of the ADAs, and does not mention Detective Hennessy. (See Pltf. Opp. (Dkt. No. 27) at 12-15)

[9] Even if Plaintiff had not abandoned these claims, the Court likely would grant Defendants summary judgment.

As to the denial of the right to a fair trial claim, the Complaint alleges that "Hennessy, Scaccia and Chernin intentionally coerced statements and identifications . . . [and] coerced Russo into making false identifications and giving false testimony." (Cmplt. (Dkt. No. 1) ¶ 46) The facts recited in the Complaint make clear that, as to Hennessy, Plaintiff's theory is that he coerced Russo's allegedly false identification, and that, as to the ADAs, Plaintiff's theory is that they elicited false testimony. (Id. ¶¶ 23, 31)

It is "'firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer.'" Harris v. City of New York, 222 F. Supp. 3d 341, 351 (S.D.N.Y. 2016) (quoting Zahrey v. Coffee, 221 F.3d 342, 355 (2d Cir. 2000)). To prove denial of the right to a fair trial based on fabrication of information, Plaintiff must prove: "an '(1) investigating official (2) fabricate[d] information (3) that [wa]s likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result.'" Quiller v. City of New York, No. 16 Civ. 3205 (RJS), 2018 WL 3418777, at *4 (S.D.N.Y. July 13, 2018) (quoting Garnett v. Undercover Officer C0039, 838 F.3d 265, 279 (2d Cir. 2016)).

As to the ADAs, Plaintiff's fair trial claim fails because the ADAs were not acting as "investigating officials" when they allegedly coerced Russo into giving false testimony. A prosecutor is protected by absolute immunity from Section 1983 claims when her conduct "'occur[s] in the course of [her] role as an advocate'"; such conduct encompasses "'presenting the case at trial' or at other court proceedings." Watson v. Grady, No. 09 Civ. 3055 (KMK), 2010 WL 3835047, at *14 (S.D.N.Y. Sept. 30, 2010) (quoting Hill v. City of New York, 45 F.3d 653,

22

Because Plaintiff consents to the dismissal of his false arrest claims (see Pltf. Opp. (Dkt. No. 27) at 7, n.1), those claims will be dismissed.

## III. MALICIOUS PROSECUTION CLAIMS

The Complaint pleads malicious prosecution claims under both Section 1983 and New York law.

---

662 (2d Cir. 1995)) Liability may attach, however, "'[w]hen a prosecutor performs the investigative function normally performed by a detective or police officer.'" Id. at *15 (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993)); see also Zahrey, 221 F.3d at 349 (noting that a fair trial claim concerns "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity) (emphasis added). A prosecutor's presentation of evidence at trial is not an investigative function. Instead, the alleged "falsification of evidence and the coercion of witnesses . . . have been held to be prosecutorial activities for which absolute immunity applies." Collins v. City of New York, 923 F. Supp. 2d 462, 471 (E.D.N.Y. 2013) (quoting Taylor v. Kavanagh, 640 F.3d 450, 452 (2d Cir. 1981)); see also Watson, 2010 WL 3835047, at *16 ("Most of Plaintiff's allegations against . . . [District Attorney] Grady and [Deputy District Attorney] Whitesell are thinly veiled malicious prosecution claims that are barred by absolute immunity. . . . [T]o the extent Plaintiff alleges that Defendants Grady and Whitesell presented false evidence . . . they are protected by absolute immunity for such acts of advocacy."). Accordingly, even if Plaintiff had not abandoned his fair trial claim, it would likely fail as to the ADAs.

As to the fair trial claim against Defendant Hennessy, Plaintiff has not offered evidence suggesting that Hennessy "fabricate[d] information" with respect to Russo's identification. To the contrary, Plaintiff admits that

> Detective Hennessy showed Russo two photo arrays in order to determine if any of those depicted were involved in the shootings. Russo was instructed that if he recognized anyone, he would point to his picture, nod his head up and down affirmatively and snap his fingers. . . . In the first photo array, Russo identified the man depicted in position six who was plaintiff. In the second photo array, Russo identified the man depicted in position five who was Allen Bell. Russo signed both photo arrays. . . .

(Pltf. R. 56.1 Stmt. (Dkt. No. 28) ¶ 9) Because Bruno has offered no evidence that Hennessy coerced or fabricated information with respect to Russo's identification, his fair trial claim against Detective Hennessy would likely fail on the merits.

As discussed below, Plaintiff's malicious prosecution claim against Hennessy fails on the merits.

## A.    State Law Malicious Prosecution Claim

To succeed on a claim for malicious prosecution under New York law, a plaintiff must demonstrate: "'(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice.'" Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003) (quoting Colon v. City of New York, 60 N.Y.2d 78, 82 (1983)).

Here, Defendants claim that Plaintiff's malicious prosecution claim fails because (1) probable cause existed; and (2) there is no evidence of malice. (See Def. Br. (Dkt. No. 24) at 20)

Under New York law, a plaintiff alleging malicious prosecution must prove the absence of probable cause, for "the existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino, 331 F.3d at 72 (citation omitted). Moreover, where a grand jury has indicted, the indictment "creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence[,] or other police conduct undertaken in bad faith,'" id. (quoting Colon, 60 N.Y.2d at 83) (emphasis in original).

Here, Plaintiff concedes that "sufficient evidence existed to establish probable cause for [his] arrest." Plaintiff argues, however, that "following his arrest and indictment, it became clear during the investigation that there was a dissipation of probable cause." (Pltf. Opp. (Dkt. No. 27) at 13)

"Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." Lowth v. County of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996, amended May 21, 1996) (internal quotation marks and citations omitted). But "[i]n order for probable cause to dissipate, the groundless nature of

the charges must be made apparent by the discovery of some intervening fact." Id. (citing Callan v. State, 73 N.Y.2d 731 (1988)).

Assuming arguendo that probable cause can dissipate after an indictment has been obtained,[10] Plaintiff has not proffered evidence creating a material issue of fact as to this issue.

Construing Plaintiff's dissipation argument generously, he appears to contend that: (1) there was no evidence demonstrating that Plaintiff had an "intent to kill"; (2) notwithstanding the absence of evidence on this point, "the Bronx District Attorney's Office by ADA Scaccia . . . proceeded with the prosecution"; (3) DNA evidence indicated a possible third suspect; (4) Kevin Russo identified Jose Diaz as a possible shooter; and (5) ADA Scaccia "coached" Russo to testify

---

[10] It is unclear whether, as a legal matter, probable cause can dissipate once an indictment has been obtained. Some courts appear to have assumed that the dissipation analysis applies to post-indictment proceedings, see, e.g., Battisti v. Rice, No. 10 Civ. 4139 (JS) (AYS), 2017 WL 78891, at *12-13 (E.D.N.Y. Jan. 9, 2017) (addressing on the merits plaintiff's claim that probable cause reflected in indictment had been dissipated by post-indictment discovery of evidence tending to discredit the primary witness against plaintiff), while other courts have rejected that notion, or questioned whether probable cause can "dissipate" for the purposes of a malicious prosecution claim once an indictment has been obtained. See Fappiano v. City of New York, No. 01 Civ. 2476 (SLT) (SMG), 2015 WL 94190, at *13 n.10 (E.D.N.Y. Jan. 7, 2015), aff'd, 640 F. App'x 115 (2d Cir. 2016) ("There is language from the New York Court of Appeals suggesting that New York's presumption of probable cause cannot be vitiated by events that occurred after the grand jury indictment was returned. . . ." (emphasis in original) (citing Colon, 60 N.Y.2d at 82-83)); see also Wilson v. City of New York, 480 F. App'x 592, 595 (2d Cir. 2012) (malicious prosecution claim failed "[e]ven assuming arguendo that probable cause can 'dissipate' after the grand jury indictment has been filed"); Burgess v. DeJoseph, No. 14 Civ. 1371 (MAD) (ATB), 2017 WL 1066662, at *7 (N.D.N.Y. Mar. 21, 2017) (rejecting "[p]laintiff's argument based on evidence that came to light after the initiation of the prosecution," because "such evidence was not available when Plaintiff was arraigned . . . . '[F]or a malicious prosecution claim, probable cause is measured at the time of the arraignment.' . . . [B]y the time such [exculpatory] evidence came to light, it was Chief ADA Doran's prerogative to pursue the charges" (quoting Valera v. City of Troy, No. 10 Civ. 1390, 2014 WL 2176148, at *5 (N.D.N.Y. May 22, 2014))

Here, this Court need not resolve the issue, because Plaintiff has not proffered evidence vitiating the finding of probable cause reflected in the indictment.

at trial that Bell was the shooter, after Russo testified that he could not remember who had shot him. (Pltf. Opp. (Dkt. No. 27) at 13-15)

As an initial matter, Plaintiff's contention that "there was absolutely no evidence to establish plaintiff's intent to kill" is inaccurate. Because "'[i]ntent as a separate item of proof does not commonly exist,'" Jones v. Duncan, 162 F. Supp.2d 204, 216 (S.D.N.Y. 2001) (quoting Mallette v. Scully, 752 F.2d 26, 32 (2d Cir. 1984), "[i]ntent may . . . be inferred from the defendant's conduct and the surrounding circumstances." Vera v. Hanslmaier, 928 F. Supp. 278, 284 (S.D.N.Y. 1996) (quotation marks and citation omitted).

"In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" Rounseville v. Zahl, 13 F.3d 625, 629 (2d Cir. 1994) (quoting Pandolfo v. U.A. Cable Systems of Watertown, 171 A.D.2 1013, 1013 (4th Dept. 1991)); see also Dukes v. City of New York, 879 F. Supp. 335, 341 (S.D.N.Y. 1995) ("As with probable cause to arrest, probable cause to prosecute consists of 'such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty.'" (quoting Colon, 60 N.Y.2d at 82)).

Here, there is evidence that Plaintiff (1) admitted that he had accompanied Bell to Apartment 54 to purchase drugs; (2) was present in the apartment when Russo was shot; (3) fled with Bell after the shooting; (4) told Bell to "get the knife" or "get the gun" during their flight from Apartment 54 after the shootings; (5) left the apartment with his hands and clothing covered in blood; (6) removed the blood at the first opportunity; and (7) agreed with Bell not to talk about the shootings with anyone. Moreover, in Russo's grand jury testimony, he identified Bell as the shooter and stated that Bruno had accompanied Bell. Plaintiff's account of serendipitously

escaping death due to the sudden jamming of the shooter's handgun was also open to question. Acknowledging that the First Department concluded that this proof does not constitute proof beyond a reasonable doubt of Plaintiff's intent to kill, it is sufficient to meet the probable cause standard.

Indeed, Plaintiff concedes that there was probable cause to arrest him for murder (See Pltf. Opp. (Dkt. No. 27) at 13 ("[S]ufficient evidence existed to establish probable cause for Bruno's arrest, [but] following [Plaintiff's] arrest and indictment, it became clear during the investigation that there was a dissipation of probable cause.")), and the post-indictment proof of Plaintiff's intent to kill is largely the same as the proof available pre-indictment. There is no "intervening fact" that was "discover[ed]" subsequent to arrest and indictment that dissipated probable cause.

The post-indictment DNA evidence does not, for example, dissipate probable cause. The DNA evidence "revealed three distinct male profiles," none of which matched Plaintiff's DNA, and one – Male Donor B – that matched Bell's DNA. (See Plaintiff's R. 56.1 Stmt. (Dkt. No. 28) ¶ 32; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 29) ¶ 32) The DNA evidence "indicates that Male Donor A" who is neither Plaintiff nor Bell – was the source of DNA taken from the hallway of Newton's apartment (see Laboratory Report (Dkt. No. 31-1) at 10), and "was a major contributor to the DNA mixture found on the broken pistol handle found in [Newton's] apartment." (Plaintiff's R. 56.1 Stmt. (Dkt. No. 28) ¶ 32)

According to Plaintiff, this evidence "corroborate[s] Plaintiff's version that there was a third unidentified male who committed the shootings." (Pltf. Opp. (Dkt. No. 27) at 19) Although the DNA evidence lends support to Plaintiff's claim of an unidentified shooter, it does not "ma[k]e apparent" the "groundless nature of the charges" and so does not dissipate probable

cause. See Fappiano, 2015 WL 94190, at *6, *14 (serology results establishing that saliva and semen at crime scene were from a donor with a different blood type than plaintiff did not vitiate probable cause because "intervening facts must establish 'the groundless nature of the charges,' not merely lend some support [to] the criminal defendant's defense" (citation omitted)); cf. Burgess v. DeJoseph, No. 514 CV 1371 (MAD) (ADB), 2017 WL 1066662, at *7, aff'd, 725 F. App'x 36 (2d Cir. 2018) (N.D.N.Y. Mar. 21, 2017) ("[T]he fact that Defendants did not locate a murder weapon or the orange hooded 'C' sweatshirt described by eyewitnesses . . . is not sufficient to defeat probable cause because the failure to uncover such evidence does not establish that the charges against Plaintiff were 'groundless.'" (citation omitted)).[11]

In contending that probable cause had dissipated by the time of trial, Plaintiff argues that Russo no longer recalled that Bruno was at the apartment that evening. He also complains that ADA Scaccia impermissibly "coached" Russo at trial to testify that Bruno was present. See Pltf. Opp. (Dkt. No. 27) at 15.

In support of this argument, Plaintiff points out that Russo initially testified at trial that he could not remember who shot him, saying that he recalled only that he had "blacked out and woke up in the hospital." ADA Scaccia then sought to introduce Russo's grand jury testimony to establish that Plaintiff was in the apartment when Russo was shot. The court reserved decision on that application. The following day, Russo told the jury that he now

---

[11] Plaintiff also contends that Russo's statement that Jose Diaz had put a gun to his head dissipated probable cause. (Pltf. Opp. (Dkt. No. 27) at 14) As discussed above, however, Plaintiff contends that probable cause dissipated post-indictment, and Russo's grand jury testimony concerning Diaz took place pre-indictment. Moreover, during the same grand jury proceeding, Russo identified Bell as the person who shot him, and testified that Plaintiff was present in the apartment at the time. (See Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 13; Pltf. R. 56.1 Stmt. (Dkt. No 28) ¶ 13) While Russo's grand jury testimony concerning Diaz casts doubt on his credibility, it does not render the charges against Plaintiff "groundless."

remembered that Bell had shot him and that Bruno had been in the apartment at the time. (See Pltf. Opp. (Dkt. No. 27) at 14-15; Pltf. R. 56.1 Stmt. (Dkt. No. 28) ¶¶ 28-31; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 29) ¶¶ 28-31) Russo explained that his memory had been jogged by a crime scene photograph he had seen, which showed his friend Newton lying dead on the floor; the photograph had "brung back that whole day like it was just like it just happened." (Tr. (Dkt. No. 30-7) at 17; (Dkt. No. 30-8) at 5) Russo flatly denied that anyone had coached him "to change what [he had] said [the day before]." (Tr. (Dkt. No. 30-8) at 5-6; Tr. (Dkt. No. 30-7) at 14-15)

There is no evidence that ADA Scaccia improperly coached Russo to change his testimony. Moreover, given Russo's testimony that his grand jury testimony concerning Bruno had been truthful – in the event that Russo had not recalled at trial Bruno's presence in his apartment at the time of the shooting – his grand jury testimony on this point would likely have been admissible as past recollection recorded. See People v. Taylor, 80 N.Y.2d 1, 8 (1992) ("The requirements for admission of a memorandum of a past recollection are . . . that the witness observed the matter recorded, the recollection was fairly fresh when recorded or adopted, the witness can presently testify that the record correctly represented his knowledge and recollection when made, and the witness lacks sufficient present recollection of the recorded information."); see also People v. Barber, 186 A.D.2d 483, 484 (1st Dept. 1992) (admission of sworn felony statement as past recollection recorded proper where "[t]he witness subsequently testified that he did not recall whether he had seen the defendant pull out a gun," but "recalled making the felony statement [– in which he said that he saw defendant pull out a gun and shoot a victim –] to the assistant district attorney and asserted that he had tried to be accurate at the time it was made"). Accordingly, there was no dissipation of probable cause prior to trial because – even if Russo had

not been able to recall at trial Bruno's presence in his apartment at the time of the shooting – Russo's grand jury testimony on this point would have likely been admissible.

Because Plaintiff has not proffered evidence that probable cause dissipated post-indictment, or that the presumption of probable cause created by indictment was rebutted, Defendants are entitled to summary judgment on Plaintiff's state law malicious prosecution claim.

**B.**     **Section 1983 Malicious Prosecution Claim**

In order for Plaintiff to prevail on his Section 1983 malicious prosecution claim, Bruno must "demonstrate: (i) the commencement or continuation of a criminal proceeding against h[im]; (ii) the termination of the proceeding in h[is] favor; (iii) that there was no probable cause for the proceeding; and (iv) that the proceeding was instituted with malice." Mitchell v. City of New York, 841 F.3d 72, 79 (2d Cir. 2016) (internal quotation marks and citations omitted).[12]

Plaintiff's Section 1983 malicious prosecution claim fails for the same reason his state claim fails: Bruno concedes that sufficient cause to arrest and indict him existed, and – assuming arguendo that probable cause can dissipate post-indictment – has not offered evidence that probable cause dissipated post-indictment. Accordingly, Defendants are entitled to summary judgment on Plaintiff's Section 1983 malicious prosecution claim.

---

[12] The Second Circuit had long maintained that "[c]laims for . . . malicious prosecution[] brought under § 1983 . . . are substantially the same as claims for . . . malicious prosecution under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks and citation omitted); see also Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010) ("In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." (citations omitted)). However, the Second Circuit recently clarified that "federal law defines the elements of a § 1983 malicious prosecution claim, and . . . a State's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements." Lanning v. City of Glen Falls, 908 F.3d 19, 25 (2d Cir. 2018) (holding that federal precedent defining "favorable termination" governs Section 1983 malicious prosecution claims, irrespective of changes in New York malicious prosecution law).

## C. Claims Against the City of New York

### 1. *Monell* Claim

"'[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)). Where a plaintiff has not made out a constitutional violation, a Monell claim fails as a matter of law. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam) ("[I]f the [police officer] inflicted no constitutional injury on [the] respondent, it is inconceivable that [the city] could be liable to [the] respondent."); Lanning v. City of Glens Falls, 908 F.3d 19, 30 (2d Cir. 2018) ("Because Lanning has not plausibly alleged an underlying constitutional violation, his Monell claims against the municipal defendants necessarily fail." (citing See Askins v. Doe No. 1, 727 F.3d 248, 253 (2d Cir. 2013)).

Because Plaintiff has not demonstrated that he suffered a constitutional violation, the City is entitled to summary judgment on his Monell claim.

### 2. *Respondeat Superior* Claims

Although a municipality cannot be held liable for a Section 1983 violation on a respondeat superior theory, see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978), such liability is permissible under New York law. Bonds v. City of New York, No. 12 Civ. 1772 (ARR) (MDG), 2014 WL 2440542, at *10 n.5 (E.D.N.Y. May 30, 2014) (citing Anderson v. City of New York, 817 F. Supp.2d 77, 98 (E.D.N.Y. 2011); see also Chimurenga v. City of New York, 45 F. Supp. 2d 337, 344 (S.D.N.Y. 1999) ("Under the common law . . . a municipality may be held liable for . . . malicious prosecution on a theory of respondeat superior." (citation omitted)).

Municipal liability is, however, contingent on proof of an underlying violation. <u>See, e.g.</u>, <u>Clarke v. City of New York</u>, No. 96 Civ. 5762 (ERK), 1999 WL 608857, at *14 (E.D.N.Y. July 22, 1999) ("If plaintiff can establish any of her pendent state law claims, she can recover against the City of New York under the common law doctrine of respondeat superior.")

Here, none of Plaintiff's state law claims survive summary judgment. Accordingly, the City cannot be found liable on a <u>respondeat superior</u> theory.

## CONCLUSION

For the reasons stated above, Defendants' motion (Dkt. No. 23) is granted in its entirety. Plaintiff's false arrest claims are dismissed on consent, and Defendants are granted summary judgment on Plaintiff's remaining claims. The Clerk of Court is directed to terminate the motion and close this case.

Dated: New York, New York
       February 18, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge